UNITED STATES DISTRICT COURT        ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
OLGA M. CLAUDIO,

                        Plaintiff,             MEMORANDUM AND ORDER

        -against-                               09-CV-5687 (JG)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                        Defendant.
----------------------------------------------------------------x

A P P E A R A N C E S:

    OLGA M. CLAUDIO
        103-12 90th Street
        Ozone Park, New York 11417
        Plaintiff *pro se*

    LORETTA E. LYNCH
        United States Attorney
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
    By:    Seth D. Eichenholtz
        *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        On December 28, 2006, Olga Claudio applied for Supplemental Security Income and disability insurance benefits, alleging that she had been disabled since May 25, 2006 as a result of glaucoma and epiretinal membranes. Her claim was denied on July 23, 2007. She requested a hearing before an Administrative Law Judge ("ALJ") and appeared with counsel at a hearing on December 22, 2008. In a decision dated June 2, 2009, ALJ Gal Lahat concluded that Claudio was not disabled within the meaning of the Social Security Act because she retained the residual functional capacity to perform her past relevant work as a billing clerk/coordinator and a records clerk. The Social Security Appeals Council denied Claudio's request for review on

September 28, 2009, thus making the ALJ's adverse decision the decision of the Commissioner. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

In this case, Claudio seeks review of the decision denying her benefits, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner has moved for judgment on the pleadings, and I heard oral argument on May 14, 2010. Because the Commissioner's decision is supported by substantial evidence in the record, I grant his motion.

BACKGROUND

Claudio is 63 years old. She worked full-time to support herself from 1966, when she turned 18, until 2006, when she turned 58. (R. 111.) From 1973 until 1992, she worked as a keypunch operator, manually entering data using a keyboard. While working as a keypunch operator, Claudio, who attended school only through the eighth grade, earned her GED and completed classes in medical terminology and computer skills. (R. 33.) In 1993 she began working as a medical billing analyst, and in 1997 she began working as a medical billing coordinator. These jobs required her to scrutinize documents and input information into a computer. (R. 45-46.)

A.     *Medical Evidence*

In 2002, Claudio began experiencing pain in both eyes and was diagnosed with glaucoma. In March 2006, while she was driving, the pain became so intense that she pulled over to the side of the road. After recovering, she sought treatment at the emergency room of the New York Eye and Ear Infirmary, a hospital in Manhattan. (R. 36.) She complained that her eyes had been tearing and painful for two weeks and that they felt as though they were irritated by grains of sand. (R. 157.) She rated the severity of her pain as "one" on a scale from 0 to 10 (ten being the worst). (*Id.*) In addition to glaucoma, the examining doctor diagnosed her with

epiretinal membrane, blepharitis, and dry eye syndrome.[1] (R. 158.) She had already been prescribed Lumigan, a topical glaucoma medication intended to reduce intraocular pressure; the doctor instructed her to apply Systane and Refresh lubricant drops as well. (*Id.*)

At a visit in April 2006, the examining doctor noted that Claudio had a history of epiretinal membrane and that she complained of no pain or other symptoms. The doctor reported that a GDx imaging test revealed "severe thinning" of the nerve fiber layer in the back of the eye, indicating advanced glaucoma, but that this result was unreliable and thus an OCT (Optical Coherence Tomography) imaging test of the eye should be conducted.[2] (R. 159.)

In late June 2006, Claudio had laser surgery for glaucoma on her left eye (R. 193-94); in early July, she had the same surgery on her right eye (R. 197-98). After each procedure, she was prescribed Pred Forte, a steroid used to reduce eye inflammation, and told to apply it to the affected eye for five days. (R. 194, 198.) At that time, she was already applying Lumigan drops twice a day, Systane drops three times a day, and pilocarpine drops four times a day.[3] (R. 160.)

Claudio received follow-up care at the New York Eye and Ear Infirmary until November 2006. The treatment notes from that period indicate that she consistently suffered from inflammation and pressure in her eyes and that she was prescribed a growing assortment of medications to manage her symptoms. In late July, she was suffering from iritis and still applying Pred Forte, although her doctor expressed hope that her use of that drug could be slowly tapered off. (R. 222.) In early August, she was complaining of pain, redness, and light

---

[1] Epiretinal membrane resembles scar tissue and forms over the macula, the tissue near the center of the retina responsible for central vision. *See* www.mayoclinic.org/retinal-diseases/epiretinal-membrane.html. The disease, which usually progresses slowly, causes blurring and distorted vision. *Id.* Blepharitis is inflammation of the eyelid near the eyelashes and can cause dry, scratchy, or watery eyes. *See* www.mayoclinic.org/medical-edge-newspaper-2009/oct-02b.html.
[2] The results of this test do not appear to be in the record.
[3] Pilocarpine, like Lumigan, is a drug used to treat the symptoms of glaucoma. *See* http://www.drugs.com/mtm/pilocarpine.html.

sensitivity. An examining doctor described her eyes as cycloplegic, indicating that the muscles that control the entry of light and permit focusing were impaired or paralyzed. (R. 185.) By mid-August, she was applying Pred Forte, or some other type of steroid, every seven hours. Though her pain had "resolved," according to an examining doctor, her post-operative iritis lingered, she had developed a response to the steroids, and she continued to experience high intraocular pressure in her right eye. Her doctor directed her to apply Cosopt to her right eye, begin using Acular, stop using pilocarpine, and switch from Pred Forte to Lotemax.[4] (R. 186.) In late August, the examining doctor noted that although there was some improvement in Claudio's symptoms, the post-operative iritis and steroid response remained. By then she was applying six medications -- Acular, Cosopt, Lotemax, Lumigan, Systane, and Genteal -- to her eyes every day, yet continued to report pain in her right eye. (R. 188.)

The examination record for Claudio's September 22, 2006 appointment contains a note that Claudio said she felt "great" and had used no drops that day. (R. 189.) Nevertheless, the examining doctor detected inflammation of the uvea (*id.*), and, upon referral, a specialist confirmed the suspicions of uveitis. (R. 175.) In October, Claudio began using a new drug, Alphagan P, prescribed to lower intraocular pressure. (R. 192.) Despite her seven-drug regimen, she still suffered from iritis, steroid response, and pain in her left eye. (*Id.*)

In April 2007, Claudio began experiencing photopsia and floaters and was referred to Dr. Joseph Crapotta. He noted she was using Cosopt, Genteal, and Restasis.[5] He

---

[4] Cosopt is used to treat intraocular pressure associated with glaucoma. *See* http://www.merck.com/product/usa/pi-circulars/c/cosopt/cosopt_ppi.pdf. Acular is a non-steroidal anti-inflammatory drug intended to reduce pain, burning, and stinging. *See* http://www.allergan.com/products/eye_care/acular.htm. Lotemax is a corticosteroid designed to relieve inflammation. *See* http://www.bausch.com/en_US/downloads/ecp/pharma/general/ lotemaxinsert.pdf.

[5] Restasis is a drug applied directly to the eye that is intended to stimulate tear production and ease chronic inflammation and dryness. *See* http://www.restasis.com.

diagnosed her with epiretinal membranes and symptomatic posterior vitreous detachment in the left eye. (R. 253-56.)

In a June 2007 response to a questionnaire by the Division of Disability Determinations in the New York State Office of Temporary and Disability Assistance,[6] Dr. Edward Gluck stated that he had been examining Claudio at four-month intervals since February 2001. (R. 257.) He noted that she had been diagnosed with glaucoma and was previously prescribed Lumigan drops. (R. 258.) He did not answer questions regarding her symptoms, the expected duration and prognosis of her condition, or limitations on physical activity resulting from her condition. (*Id.*) He did check boxes indicating that she had no limitations on her ability to lift and carry objects, stand, walk, sit, push, or pull. (R. 260.)

In July 2007, Dr. Robert Zoltan performed a consultative examination. He observed that the cornea, conjunctiva, lens, and macula were clear in both eyes and that the visual fields were full. He also reported that slit lamp studies of the anterior chamber in both eyes showed them to be deep and quiet. He concluded that Claudio had no visual disability. (R. 271.)

In a form report dated January 28, 2008, Dr. Edward Shen stated that he had first seen Claudio in November 2006, when she complained of burning, photophobia, and blurred vision in both eyes, and that she continued to see him every three months for treatment. (R. 274.) He reported his diagnosis as glaucoma, hyperopia, presbyopia, dry eye syndrome, early cataracts, and astigmatism in the left eye. (R. 274.) He noted that she was using Cosopt, Restasis, Lotemax, Systane, Genteal, and eating bilberries.[7] (R. 279.) He also observed that although her macula (R. 274) and visual field (R. 278) were normal in both eyes, she suffered

---

[6] This office adjudicates disability claims on behalf of the Social Security Administration.
[7] Bilberries are thought to be beneficial in treating a variety of eye disorders, including poor night vision, eyestrain, and myopia. *See* http://www.nlm.nih.gov/medlineplus/druginfo/natural/patient-bilberry.html.

5

from dryness, photophobia, and blurred vision in both eyes, and occasional pain in her left eye (R. 279). Shen checked "yes" in response to the questions whether she could travel alone by bus and whether her impairments were likely to produce "good days" and "bad days." (R. 280.) In response to the question of how often Claudio's experience of pain and other symptoms was "severe enough to interfere with attention and concentration," he selected "seldom." (*Id.*) Shen did not answer questions about whether the diagnosed impairments affected Claudio's ability to function, if she need to take unscheduled breaks at unpredictable intervals during the workday, and how often she was likely to be absent from work as a result of her impairment. (*Id.*)

B.     *Vocational Evidence*

Amy Leopold, a vocational expert, appeared and testified at the hearing before ALJ Lahat. Leopold testified that Claudio was of "advanced [age] approaching retirement," or perhaps was already "at retirement." (R. 47.) Leopold was asked whether a hypothetical individual with Claudio's age, education, and work background, limited only with regard to exposure to sunlight and wind, could perform Claudio's past relevant work, and affirmed that the hypothetical individual could do so. (*Id.*) The ALJ then asked Leopold whether the hypothetical individual could do Claudio's past relevant work if she were required to take a five-minute break every hour to rest her eyes. (*Id.*) Leopold responded that the individual would have no vocational limitations and could perform all of Claudio's past relevant work. (R. 48.) In response to questioning by Claudio's attorney, Leopold testified that the hypothetical individual could perform Claudio's past work as a record analyzer, but not as a billing clerk, if she were restricted to only "occasional" use of a computer. (*Id.*) However, if the hypothetical individual were unable to "star[e] at documents for a prolonged period of time," it would be "difficult" for her to perform Claudio's past work as a record analyzer. (R. 51.)

DISCUSSION

A.  *The Standard of Review*

To be found eligible for disability benefits, Claudio must show that, "by reason of [a] medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 423(d)(2)(A).[8]

The Social Security regulations direct a five-step analysis for evaluating disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

---

[8] Work may be substantial even if it is not full-time or if it generates less income or carries less responsibility than previous employment. 20 C.F.R. § 404.1572. Work is gainful "if it is the kind of work usually done for pay or profit, whether or not profit is realized." *Id.* Activities such as household tasks, hobbies, therapy, school attendance, club activities, or social programs are generally not considered to be substantial gainful activity. *Id.*

7

*De Chirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir. 1998) (internal quotation marks omitted); *see* 20 C.F.R. § 404.1520. The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). When conducting the analysis, the Commissioner must consider (1) the objective medical facts; (2) the medical opinions of the examining or treating physicians; (3) the subjective evidence of the claimant's symptoms submitted by the claimant, her family and others; and (4) the claimant's educational background, age, and work experience. *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

On review, the question presented is whether the Commissioner's decision to deny Claudio benefits is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 31 (internal quotation marks omitted).

B.  *Analysis*

The ALJ followed the five-step procedure outlined above. He first determined that Claudio had not engaged in substantial gainful activity since May 25, 2006, the date on which she claimed she became unable to work as a result of glaucoma and epiretinal membranes. (R. 21.) At the second and third steps, he determined that she had a severe combination of visual impairments, consisting of glaucoma, hyperopia, presbyopia, astigmatism, dry eye syndrome, and early cataracts (*id.*), but that they did not correspond to an impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (R. 22.) At the fourth and fifth steps, the ALJ found that Claudio possessed the residual functional capacity to perform the full range of work at all exertional levels, including her past relevant work, but that her impairments precluded her from

doing work that required exposure to direct sunlight or wind.  (*Id.*)  Accordingly, the ALJ concluded that Claudio was not disabled and denied her application for benefits.  (R. 27.)

        1.      *The ALJ Properly Determined Claudio's Residual Functional Capacity*

The ALJ's determination that Claudio retained the residual functional capacity to perform her past sedentary relevant work as a billing clerk/coordinator and records clerk was supported by substantial evidence in the record, including the objective medical evidence and the testimony of the vocational expert at the hearing.

In determining Claudio's residual functional capacity, the ALJ correctly relied on Dr. Shen's findings that Claudio's visual acuity in both eyes was 20/25 to 20/20 with correction; that her field of vision was full in both eyes; that her muscle function was normal and her visual efficiency was "ok"; that Claudio's dry eye and glaucoma were medically controlled in both eyes; and that her pain or other symptoms would "seldom" interfere with her attention and concentration.  The ALJ also relied on Dr. Zoltan's findings that Claudio's corneas, conjunctiva, lenses and macula were clear and her tension readings in both eyes were within normal limits.  The ALJ further relied on Dr. Gluck's findings, *inter alia*, that Claudio's eye tension was within normal limits and that she had no limitations with respect to her ability to lift, carry, stand, walk, sit, push and pull.  (R. 24-26.)  Finally, the ALJ relied on the conclusions of the vocational expert, who testified that a hypothetical individual who required breaks of five minutes in duration each hour to rest her eyes could perform Claudio's past relevant sedentary work.  (R. 27.)  The ALJ's determination that Claudio had the residual functional capacity to perform her past relevant work was thus well-supported by the evidence of record.

2. *The ALJ Properly Considered Claudio's Statements Regarding Her Symptoms*

In resolving whether a claimant is disabled, the Commissioner must consider subjective evidence of pain or disability testified to by the claimant. *See* 20 C.F.R. § 416.929(a). However, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged." *Davis v. Massanari*, No. 00 Civ. 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001).

Here, the ALJ considered the seven factors set out in 20 C.F.R. § 416.929(c)(3) by which the Commissioner must evaluate claimants' subjective testimony,[9] and found that plaintiff's testimony about her eye symptoms and limitations were entitled to limited weight because it did not accord with "the overall record, including the objective medical evidence and clinical findings." (R. 26.) I see no unfairness or impropriety in the manner in which that determination was made.

Like the ALJ, I have considered Claudio's exemplary work record, but I nevertheless feel compelled to grant the Commissioner's motion due to the strength of the objective medical and vocational evidence testimony.

---

[9] These factors include (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual received or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3).

## CONCLUSION

Because ALJ Lahat's decision is supported by substantial evidence, the Commissioner's motion for judgment on the pleadings is granted.

> So ordered.
>
> John Gleeson, U.S.D.J.

January 11, 2011
Brooklyn, New York